CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

**AUG 1 3 2019**

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA and COMMONWEALTH OF VIRGINIA, *ex rel.* | : : : |
| KIMBERLY HARTMAN, R. N. | : : CIVIL ACTION NO. 6:19CV00053 |
| and | : : |
| ANNA BASS, R. N., | : **Jury Trial Demanded** |
| and | : : **TO BE FILED UNDER SEAL AND** |
| DEBRA WOODY,  *Relators* | : *IN CAMERA* : : |
| v. | : : |
| CENTRA HEALTH, INC.,  *Defendant.* | : : : |

### COMPLAINT

1.     This *qui tam* action is brought by Relators Kimberly Hartman ("Ms. Hartman"), Anna Bass ("Ms. Bass") and Debra Woody ("Ms. Woody") in the names of the United States of America and the Commonwealth of Virginia, respectively, to recover damages and penalties arising from the submission of false claims for payment by the Defendant, Centra Health, Inc. ("Centra") under the federal False Claims Act (31 U.S.C 3729 *et seq.*) and the Virginia Taxpayers Against Fraud Act (Code of Virginia § 8.01-216.1 *et seq.*)  Ms. Hartman also asserts her own claims for (i) retaliation in violation of 31 U.S.C. 3730(h), (ii) retaliation in violation of the Emergency Medical Treatment & Labor Act ("EMTALA") (42 U.S.C. 1395dd(i)) and (iii) wrongful termination in violation of Virginia law.

2.     Ms. Hartman is an "original source" of the information pertinent to this Complaint as

defined by 31 U.S.C. 3720(e)(4).

3.      Ms. Bass is an "original source" of the information pertinent to this Complaint as defined

by 31 U.S.C. 3720(e)(4).

4.      Ms. Woody is an "original source" of the information pertinent to this Complaint as

defined by 31 U.S.C. 3720(e)(4).

5.      Ms. Hartman did not derive the allegations in this Complaint from public disclosures.

6.      Ms. Bass did not derive the allegations in this Complaint from public disclosures.

7.      Ms. Woody did not derive the allegations in this Complaint from public disclosures.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over the federal False Claims Act counts

pursuant to 31 U.S.C. 3732(A) and 28 U.S.C. 1331.

9.      This Court has subject matter jurisdiction over Ms. Hartman's federal EMTALA claim

pursuant to 42 U.S.C. 1395dd(d)(2)(A)-(B) and 28 U.S.C. 1331.

10.      This Court has jurisdiction over the false claims count under the Virginia Taxpayers

Against Fraud Act pursuant to 31 U.S.C. 3732(B).

11.      This Court has supplemental jurisdiction over Ms. Hartman's state wrongful termination

claim pursuant to 28 U.S.C. 1367(a).

12.       Venue is proper in this Court because (i) the defendant is headquartered in the Western

District of Virginia, (ii) the defendant conducts business in the Western District of Virginia and

(iii) the acts alleged in the Complaint occurred in the Western District of Virginia.

## PARTIES

13.      Plaintiff **United States of America** is a sovereign federal government.

14.     Plaintiff **Commonwealth of Virginia** is a sovereign state of the United States of America.

15.     Relator **Kimberly Hartman** is a citizen of Virginia who resides in Bedford County.  She is a licensed registered nurse who was formerly employed by defendant Centra Health, Inc.

16.     Relator **Anna Bass** is a citizen of Virginia who resides in Bedford County.  She is a licensed registered nurse who was formerly employed by defendant Centra Health, Inc.

17.     Relator **Debra Woody** is a citizen of Virginia who resides in Bedford County.  She was formerly employed employed by defendant Centra Health, Inc. as an administrative assistant to several of its managers and executives.

18.     Defendant **Centra Health, Inc**. is a Virginia non-stock corporation in the business of owning and operating hospitals and other medical businesses, practices and facilities in the Commonwealth of Virginia.  Centra owns and operates Lynchburg General Hospital ("LGH") and Virginia Baptist Hospital ("VBH"), both located in Lynchburg, Virginia.

## FACTS

### BACKGROUND RELATED TO MS. HARTMAN

19.     Ms. Hartman was hired by Centra in 2014 and was promoted to the position of Unit Manager of the Child and Adolescent Psychiatric Unit at VBH and she held that position until June 6, 2019, when her employment was abruptly terminated by Centra after she notified her superiors of falsification of claims for payment to Centra by Medicare and Medicaid and of serious EMTALA violations.

20.     As Unit Manager, Ms. Hartman was responsible for the supervision of staff in her unit and she answered to Stephanie East, Vice President of Behavioral Health,

21.     Centra is in the business of providing health care services including mental health services to individuals throughout Virginia. In particular, Centra provides mental health services through Virginia Baptist Hospital serving juvenile, adolescent, adult and geriatric patients in three separated secure psychiatric units.

22.     During her five years with Centra, Ms. Hartman witnessed many acts of fraud and misconduct, including:

- Falsification of the 15-minute observation records required to be made for each patient in each of the three psychiatric units at VBH when payment by Medicare and Medicaid was conditioned on completion of the 15-minute observations.  Specifically, staff in the psychiatric units routinely did not conduct the 15-minute observations but falsified records to indicated that they had conducted the observations.

- A cover-up orchestrated by Stephanie East of the circumstances related to the death of geriatric psychiatric patient who died as a result of the required 15-minute observations having not been conducted.

- Falsification of the hourly audits demanded by the Joint Commission to accredit the psychiatric facilities at VBH, when accreditation was contingent upon completion of hourly audits.

- Conspiracy between Stephanie East and John Ogden, Centra's Safety Coordinator, to falsify the Joint Commission audit records.

- Falsification of credentials for employees of the grant-funded Psychiatric Emergency Center at Lynchburg General Hospital to thwart an investigation after a patient was shot by a security guard.

- Fraudulent billing to Medicaid and Medicare for services that were not provided.

- Patient-dumping in violation of the EMTALA.

23. Ms. Hartman reported each of the acts of fraud noted above to Stephanie East before June 6, 2019.

24. The executives and managers at Centra, including former CEO E.W. Tibbs, former Vice President of Mental Health Ted Stryker, Stephanie East and John Ogden consistently placed financial concerns ahead of patient care and safety.

25. Indeed, upon hiring Ms. Hartman, Stephanie East assigned Ms. Hartman a book to read entitled "Patients Come Second."

26. Centra has suffered from serious mismanagement and is currently in a financial crisis.

27. Centra has a history of overbilling and recently settled a case for such overbilling with CMS.

28. Stephanie East recently transmitted an email to senior staff outlining Centra's dire financial problems and asking them to look for positions to eliminate in their departments.

29. Ms. Hartman received only positive performance evaluations during the entirety of her employment by Centra.

30. Ms. Hartman received numerous nominations and awards during employment by Centra, including:

- Virginia Top 40 Leaders Under 40 (won award)

- Virginia Nurse of the Year (nominated)

31. Ms. Hartman was reprimanded only once during the entirety of her employment by Centra – for overstaffing her unit.

*U.S. ex rels. Hartman, et al. v. Centra Health, Inc,* ● *Complaint* ● *Page 5 of 31*

32.     Ms. Hartman began to sense a change in demeanor from Stephanie East and Ted Stryker in January, 2019 after she reported that the 15-minute observation records were being falsified in the acute psychiatric units.

33.     Stephanie East chastised Ms. Hartman for accessing the security video recording that showed that a staffer had falsified 15-minute observation records and Stephanie East told Ms. Hartman that it was not her job to inspect the video recordings.

34.     After Ted Stryker was terminated as Vice President of Mental Health and Stephanie East was promoted to the position, the hostility directed toward Ms. Hartman became worse and obvious.

35.     In early June 0f 2019, Ms. Hartman became aware that Centra employees were denying transfer admission of juvenile emergency psychiatric patients in violation of the EMTALA. When Ms. Hartman raised these violations to Stephanie East and Michael Judd, her employment was terminated immediately.

36.     Ms. Hartman is in possession of a USB storage device and a laptop computer that contain documents that prove her allegations. These devices have been forensically imaged and are currently in the possession of counsel, where they are being held in trust. Centra is engaged in ongoing litigation to seek possession of the documents and to prohibit their use, transfer, release or disclosure,

## BACKGROUND RELATED TO MS. BASS

37.     Ms. Bass was hired by Centra as a registered nurse in 2018.

38.     Ms. Bass was assigned to the Adult Psychiatric Unit at Virginia Baptist Hospital.

39.     In her position at the Adult Psychiatric Unit, Ms. Bass worked the evening shift, from

6:45 p.m. to 7:15 a.m.

40.     Ms. Bass reported directly to the Charge Nurse on duty, who reported to the Unit

Manager.

41.     The Unit Manager of the Adult Psychiatric Unit was Jacob Cash.

42.     Ms. Bass worked in the Adult Psychiatric Unit until her employment was terminated in

April of 2019.

43.     Ms. Bass has personal knowledge that Centra employees in the Adult Psychiatric Unit

routinely falsified medical records and audits.

44.     Ms. Bass was wrongfully terminated from employment on the basis of a trumped-up and

false accusation of misconduct as part of a scheme to reduce the workforce at Centra by

termination for cause instead of by layoff.

## BACKGROUND RELATED TO MS. WOODY

45.     Ms. Woody worked for more than five years as an administrative assistant to several

managers and executives in Centra's mental health units.

46.     Ms. Woody took minutes of meetings in which Centra physicians and managers were

present when executives conspired to manipulate lengths of stay for patients in the psychiatric

units in order to falsify claims for reimbursement by Medicare and Medicaid.

47.     Ms. Woody was responsible for arranging and scheduling meetings between Centra's

managers and executives and is familiar with senior management policies and procedures.

48.     Ms. Woody will assist in locating, identifying and authenticating documents that will

prove that Centra presented false claims for Medicaid and Medicare reimbursement.

## CATEGORIES OF FALSE CLAIMS

I.    **FALSIFICATION OF THE 15-MINUTE OBSERVATION RECORDS IN CENTRA'S ACUTE PSYCHIATRIC UNITS AND THE COVER-UP OF CIRCUMSTANCES RELATED TO A PATIENT DEATH**

49.    As in each of the secure acute psychiatric units at VBH, 15-minute observations are required of each patient in the geriatric psychiatric unit. These mandatory observations are necessary to protect patients from harm. The observations are paid for by Medicare and Medicaid for patients who are beneficiaries of those programs upon claims for payment submitted by Centra.

50.    The 15-minute observation is so-named because it is required to be conducted every 15 minutes for every patient in the unit.

51.    The 15-minute observation consists of recording basic information about the patient's location and activity and verifying that the patient is safe.

52.    Ms. Bass personally observed the staff in a Adult Psychiatric Unit charged with performing the hourly audits sleeping on the job or spending time on the internet for hours.

53.    In January of 2019, Ms. Hartman was called to temporarily cover (as Unit Manager) in the geriatric psychiatric unit, which is located on the same floor as the child and adolescent psychiatric unit at VBH.

54.    While covering as Unit Manager in the geriatric unit,  Ms. Hartman received a text message from a Centra CNA named Roxanna Clough who was assigned to the geriatric unit, stating that she needed to meet with Ms. Hartman immediately.

55.    Ms. Hartman responded to the text message immediately and went to speak with Roxanna Clough and asked a colleague, Jacob Cash (Unit Manager of the adult psychiatric unit at VBH), to be present while she spoke with Roxanne.

56.    Roxanna Clough stated that when she went to do her morning bed check, she found a female patient unconscious on the floor lying in a pool of coffee-colored blood.  The patient was transported to the emergency room at Lynchburg General Hospital where she was pronounced dead soon after arrival.

57.    Roxanna Clough informed Ms. Hartman that the charge nurse told her not to tell the family that the patient was found in the condition that led to her death.

58.    Ms. Hartman and Jacob Cash reviewed the security camera from the night of the incident to determine weather the mandatory fifteen minute bed checks occurred and to see if there were any other medical issues that occurred during the night that would explain the patient's condition when the CNA Roxanne Clough found her.

59.    Fred Noelizaire was the CNA on duty the night of this incident, and the CNA assigned to perform bed checks on the patient.

60.    Fred Noelizaire was the CNA on duty the night of this incident, and the CNA assigned to perform bed checks on the patient.

61.    Ms. Hartman and Jacob Cash observed Fred Noelizaire on security video recording sitting in the hallway for hours not performing bed checks the morning of the patient's death.

62.    Fred Noelizaire falsified the patient records to reflect that the mandatory bed checks had been completed.

63.    Ms. Hartman consulted with staff in the geriatric unit and was informed that the staff did not have the time to conduct the 15-minute observations, so they routinely falsified them and had been doing so for years.

64.    Ms. Hartman promptly notified Stephanie East of the falsification of the 15-minute

observations.

65.     Stephanie East disciplined Fred Noelizaire by suspending him for three days for falsifying the 15-minute observation records but required staff to stay silent about the falsification of the 15-minute observation records.

66.     After he was suspended, Fred Noelizaire was subsequently terminated by Centra for falsifying the 15-minute records again and his file was marked "ineligible for rehire". Nonetheless. He was rehired by Centra shortly thereafter and he was employed at the Centra Guggenheimer Nursing Home in Lynchburg in the care of geriatric patients.

67.     Ms. Hartman notified Stephanie East that a report of the patient's death was required to be made to VHDBS.  Stephanie East instructed staff not to make the report.

68.     Ms. Bass worked the twelve hour evening shift in the Adult Psychiatric Unit.

69.     Ms. Bass personally observed the staff charged with performing the 15-minute observations in the Adult Psychiatric Unit routinely sleeping or spending time at the computer watching videos and then falsifying the observation records.

70.     Brooke Stratton, the shift supervisor in the Adult Psychiatric Unit, was aware that the 15-minute observations were not being made and that the records were being falsified.  Ms. Stratton reported this information to Jacob Cash, but the behavior continued.

71.     Security video recordings of each of the psychiatric units at VBH will demonstrate that the 15-minute observations were not being conducted and that the records of these observations were falsified.

72.     For years, Centra billed Medicaid and Medicare (and other government and private insurers) for falsified 15-minute observations for every patient in each of the psychiatric units.

Centra knowingly submitted false claims to receive payment for these services that it knew were not being provided and Centra was paid with federal and state public funds as a result of the submission of these false claims. These falsifications were material and when Centra submitted them to Medicaid and Medicare for payment, Centra certified, either explicitly or implicitly, that the 15-minute observations had been conducted.

## II.     FALSIFICATION OF JOINT COMMISSION HOURLY AUDITS TO FRAUDULENTLY MAINTAIN ACCREDITATION NECESSARY TO PARTICIPATE IN MEDICARE AND MEDICAID PROGRAMS

73.     The Joint Commission is an accrediting organization that accredits hospitals.

74.     Centra's hospitals, including LGH and VBH, are currently accredited by the Joint Commission.

75.     In June of 2018, the Joint Commission determined that the three acute psychiatric units at VBH did not meet the criteria for accreditation, due to safety hazards in those units.

76.     The safety hazards in the acute psychiatric units included ligature risks and unsafe furniture and construction.

77.     The Joint Commission and Centra agreed to a plan whereby Centra would correct the safety hazards in a timely manner and would maintain accreditation of the acute psychiatric units by conducting hourly audits of the units.

78.     The hourly audits required staff to observe potentially hazardous areas in the units and to record observations on audit forms that were required to be submitted to the Joint Commission.

79.     Ms. Hartman learned that staff in the juvenile and adolescent acute psychiatric unit were falsifying the Joint Commission hourly audits.

80.    Staff members reported to Ms. Hartman that they did not have time to conduct the hourly audits and simultaneously care for patients.  They reported that they had to chose between falsifying the audits or failing to conduct them.

81.    Ms. Hartman reported the falsification of the Joint Commission hourly audits to Stephanie East and to John Ogden.

82.    Stephanie East concluded that the staff should falsify the hourly audits.

83.    John Ogden concurred and offered to falsify the audits himself if the staff in the psychiatric units were unwilling or unable to do so.

84.    John Ogden sent Ms. Hartman an email with an example of a falsified hourly audit report attached ("EOC Hourly Rounding Audits.xlsx") as a suggested method of falsifying the hourly audits in a manner that would evade detection by the Joint Commission.  His scheme involved falsifying audits to indicate improving compliance in order to avoid suspicion and detection by the auditors.  A printed copy of this document is attached hereto and incorporated herein as **EXHIBIT A**.

85.    Stephanie East lied to Joint Commission investigators about the condition of the safety hazards in the acute psychiatric units.  In communicating with Joint Commission investigators, Stephanie East falsely blamed patients for arranging furniture in a dangerous manner when she knew that her staff had actually done so.  She also concealed construction hazards from Joint Commission inspectors to avoid detection and the resulting loss of accreditation.

86.    Stephanie East and John Ogden conspired to falsify the hourly audits in order to maintain Joint Commission accreditation of the acute psychiatric units so Centra could submit false claims to Medicare and Medicaid for payment.

*U.S. ex rels. Hartman, et al. v. Centra Health, Inc,* • *Complaint* • *Page 12 of 31*

87.     Stephanie East joked and bragged about her deception by repeatedly informing her subordinates that she was "one step ahead" of the Joint Commission.

88.     As a result of falsifying the hourly audits, Centra maintained accreditation of its acute psychiatric units by the Joint Commission.  If the Joint Commission had discovered that Centra had falsified the audits or that it had not conducted them as agreed, the Joint Commission would have revoked the accreditation of the acute psychiatric units.

89.     Centra submitted claims to Medicare and Medicaid when its employees knew that the hourly audits had not been conducted and that reports had been falsified to show that the hourly audits had been conducted.

90.     Centra submitted claims to Medicare and Medicaid that it knew were not eligible for payment because the records underlying Joint Commission accreditation, a necessary condition for participation in both Medicare and Medicaid, were falsified.

91.     John Ogden knowingly and deliberately (i) solicited the falsification of the hourly audit reports, (ii) conspired with Stephanie East and others to falsify the hourly audit reports and to solicit others to do so, (iii) falsified hourly audit reports and (iv) delivered falsified hourly audit reports to representatives of the Joint Commission with the intent to defraud and deceive the Joint Commission and to defraud and deceive Medicare, Medicaid and DMAS by the submission of false claims.

92.     Security video recordings of each of the psychiatric units at VBH will demonstrate that the hourly audits were not being conducted and that the records of these observations were falsified.

93.     When it submitted claims to Medicaid and Medicare for payment for the care of patients

in psychiatric units, Centra falsely certified, either explicitly or implicitly, that it cooperated with

the accreditation requirements of the Joint Commission, when in reality it was flagrantly,

actively and unlawfully thwarting oversight.

### III. FALSIFICATION OF CREDENTIALS OF EMPLOYEES AT THE PSYCHIATRIC EMERGENCY CENTER TO OBTAIN GRANT FUNDING AND TO CONCEAL FACTS RELATED TO THE SHOOTING OF A PSYCHIATRIC PATIENT INSIDE A SECURE UNIT

94.     In 2015, Centra began staffing the Psychiatric Emergency Center ("PEC") at LGH.

95.     The PEC was a facility funded by a grant from the Virginia Department of Behavioral

Health and Developmental Services ("DBHDS"). The grant was submitted by Horizon

Behavioral Health, the local community services board.

96.     The PEC was intended to provide psychiatric observation to patients at LGH suffering

from psychiatric emergencies.

97.     Centra executed a memorandum of understanding with Horizon Behavioral Health,

whereby Centra would design and construct the PEC and whereby Centra would comply with all

applicable federal and state statutes, regulations and policies, including Medicaid regulations.  A

copy of this memorandum is attached hereto and incorporated herein as **EXHIBIT B**

98.     Centra provided staffing in the PEC under the memorandum of understanding with

Horizon Behavioral Health.  It agreed to provide qualified and properly credentialed staff.

99.     The PEC opened in 2015 and Centra began accepting psychiatric patients at that time.

100.    In disregard if the agreement, Centra staffed the PEC with employees who lacked the

necessary credentials.

101.    After a patient was shot by an armed Centra security guard inside the PEC on January 11,

2016, regulatory agencies conducted multiple investigations of the circumstances of the shooting

and the operation of the PEC.

102.   Gina Meadows, Director and Rachel Ruiz, Unit Manager of the PEC, falsified several credentials of the PEC employees and presented the falsified credentials to investigators.

103.   As a result of failing to staff the PEC with employees who were properly credentialed and by falsifying the credentials of these employees to thwart the investigation of the shooting inside the PEC, Centra knowingly submitted false claims for payments that were funded by proceeds from the DBHDS grant for the PEC.

104.   Centra received proceeds of the DBHDS grant for the PEC to which it was not entitled as a result of the false claims it submitted for payment.

## IV.   BILLING TO MEDICAID AND MEDICARE FOR SERVICES NOT PROVIDED

105.   Centra employees and agents routinely billed Medicaid and Medicare for services that were not provided.

106.   Dr. Lisa Johnson provided services in the child/adolescent psychiatric unit at VBH in 2017 and 2018.

107.   During her employment at VBH, Dr. Johnson billed for services she did not provide, including:

- Patient histories that were never taken or documented;
- Patient discharge summaries that were never completed;
- Patient assessments that were never made.

108.   Dr. Johnson also falsified clinical information for many patients with Medicaid in order to needlessly extend their stays and in order to falsely bill Medicaid and other insurance providers for unnecessary services.

109.    Stephanie East and Dr. Michael Judd, Executive Medical Director for Mental Health, were aware of Dr. Johnson's falsification of records and the consequent overbilling to Medicaid, Medicare and other insurance programs.

110.    Dr. Johnson's practice of submitting false information was pervasive and necessarily led to the submission of false Medicaid and Medicare claims that were paid to Centra.

111.    Other Centra physicians routinely falsified the amount of time they devoted to consultations, frequently billing for 30 minute consultations when they did not conduct any consultation at all or when they actually spent less than 5 minutes in consultation.  Specifically, Centra submitted false claims submitted for consultations with respect to the following representative patients:[1]

- P. R., a 12 year old male treated in March of 2019.

- D. H., a 13 year old female treated  in March of 2019.

- E. C., a 17 year old treated in April of 2019.

- T. W., a 14 year old female treated in March of 2019.

- S. N., a 16 year old female treated in March of 2019.

- L. B., a 15 year old male treated in May of 2019.

- C. U., a 7 year old male treated in May of 2019.

- F. P., a 12 year old male treated in May of 2019.

- C. M., a male patient treated several times in 2016, 2017 and 2018.

112.    The governing body at Centra knew that the services provided to patients in its psychiatric units were not being provided and that is employees and agents were falsifying

---

[1]    Ms. Hartman is aware of the actual names of these patients, but submits their initials in order to protect their privacy.  These patients are only representative of the scope of false billing practices -- the practice was pervasive and longstanding.

records to submit false claims for payment to Medicaid and Medicare.

113.    Centra received payment from Medicare and Medicaid programs to which it was not

entitled as a result of the submission of false claims for services that were not provided.

## V.    OVERBILLING FOR PSYCHIATRIC CONSULTATIONS

114.    Centra also regularly overbilled for psychiatric consultations in each of the three

psychiatric units at VBH.  Physicians and other caregivers routinely falsified records by

exaggerating the amount of time they spent in consultations and Centra submitted false claims to

Medicaid and Medicare for these instances of overbilling.

115.    Patients and their family members routinely complained to Centra's staff that these

consultations were not being conducted as recorded in the medical records, but Centra swept

these complaints under the rug and continued to bill Medicare and Medicaid for these false

claims.

116.    Security video recordings from each of the three psychiatric units at VBH will

demonstrate the actual duration of patient consultations and so will prove that Medicare and

Medicaid were being overbilled for these consultations.

## VI.   MANIPULATING PATIENT LENGTHS OF STAY IN THE PSYCHIATRIC UNITS TO BILL MEDICARE AND MEDICAID FOR MEDICALLY UNNECESSARY CARE

117.    In early 2019, Centra was in poor financial condition and was contemplating employee

layoffs.  A printed copy of an email from Stephanie East dated March 3, 2019 documents these

financial problems and is attached hereto and incorporated herein as **EXHBIT C**.

118.    Centra's managers, including Stephanie East, routinely pressured subordinates to

manipulate lengths of stay in the units to maximize payment by both government and private

insurance companies.

119.    The practice of manipulating patient lengths of stay was a longstanding one.  Indeed, as

Stephanie East, then a Unit Manager, noted in her minutes of an April 4, 2010 staff meeting:

> We are having a hard time getting insurance days for our patients.
> When doing the safety agreements, if a patient says their LOH is
> anything but 0 at home, ask them, "What would your plan be?" and
> document that on the safety contract and in PIE note.  Don't ask
> "do you have a plan" but ask, "what would your plan be?"

120.    Thus, instead of instructing subordinates to ask psychiatric patients whether or not they

had a plan of harming themselves or others, in order to submit false insurance claims, Stephanie

East directed her staff to presume that these patients had such a plan and she ordered her

subordinates to use suggestive language when interviewing these patients in order to create the

records necessary to get the false claims paid.

121.    Anthem, a large private insurer provides maximum payment for psychiatric care that does

not exceed four days, while Medicare and Medicaid pay for longer stays. To that end, Stephanie

East directed her subordinates to extend stays for Medicaid patients as long as possible, while

reducing lengths of stay for Anthem patients to four days or less. Tragically, Centra also

maintained a policy of discharging uninsured patients immediately.

122.    Centra's employees performed as Stephanie East directed by both needlessly extending

the stays of Medicaid patients while prematurely discharging Anthem patients to maximize

revenue. A simple check of the billing records will prove that Anthem patients were

systematically kept in the psychiatric units for significantly less time than Medicaid patients.

## VII.    FRAUDULENT BILLING FOR ADULT PATIENTS UNLAWFULLY TREATED IN THE CHILD AND ADOLESCENT PSYCHIATRIC UNIT AND JUVENILE PATIENTS UNLAWFULLY TREATED IN THE ADULT PSYCHIATRIC UNIT

123.    Centra also resorted to outright unlawful conduct to cheat Medicaid and Medicare into paying for services that were not provided or that were medically unnecessary or even illegal.

124.    Centra's psychiatric units are licensed by the VDBHDS, whose regulations prohibit licensed facilities from treating adults in juvenile psychiatric facilities and from treating juveniles in adult facilities.

125.    Notwithstanding the VDBHDS regulations, Centra promulgated and operated under a formal policy that allowed some adults to be treated in the Child and Adolescent Psychiatric Unit and also allowed some children to be treated in the Adult Psychiatric Unit.  A true and accurate copy of this policy is attached hereto and incorporated herein as **EXHIBIT D**.

126.    Centra falsely claimed to have obtained a variance from the VDBHDS to permit this arrangement.  No such variance was given and Centra's policy was unlawful.  A copy of recent email correspondence from an official at VDBDHS to Stephanie East discussing the lack of a variance is attached hereto and incorporated herein as **EXHIBIT E**.

127.    Instead, Centra used its unlawful policy to bilk Medicare and Medicaid out of payment for services that were never provided.

128.    Centra is paid more by Medicare and Medicaid to treat juvenile psychiatric patients than adult patients.

129.    Upon information and belief, Centra maintained a policy of admitting adult patients into the Child and Adolescent Psychiatric Unit and then billing Medicare and Medicaid at the higher rate for juvenile psychiatric care for these adult patients, when that care was neither lawful nor appropriate.

130.    Also upon information and belief, Centra maintained a policy of admitting juvenile

patients in the Adult Psychiatric Unit and then billing Medicare and Medicaid at the higher rate for juvenile psychiatric care that was never provided to these juvenile patients in the Adult Psychiatric Unit.

131.    Centra's managers were aware of and condoned these unlawful policies.

132.    Centra employees, acting in accord with Centra's unlawful policies, knowingly submitted false claims for payment to Medicare and Medicaid for juvenile psychiatric care to adult patients.

133.    Centra employees, acting in accord with Centra's unlawful policies, knowingly submitted false claims for payment to Medicare and Medicaid for juvenile psychiatric care to juvenile patients who received unlawful and inappropriate care in the Adult Psychiatric Unit.

## VIII.    EMTALA VIOLATIONS AND RETALIATION AGAINST MS. HARTMAN FOR REPORTING THEM

134.    The Emergency Medical Treatment and Labor Act ("EMTALA") prohibits hospitals from refusing to accept transfers of patients from other hospitals who need specialized care for stabilization.

135.    Around the beginning of June, 2019, Ms. Hartman became aware that the patient census in the child/adolescent psychiatric unit was abnormally low.

136.    Upon investigation of the low patient census, Ms. Hartman discovered that patients were unlawfully being denied admission for emergency treatment in her unit in violation of the EMTALA.

137.    Specifically, two young psychiatric patients who had been diagnosed with psychiatric emergencies in the emergency rooms at other hospitals in Virginia were denied transfer to the child/adolescent psychiatric unit at VBH for emergency care because they were autistic.

138.    Autism is not a valid exclusion criterion for admission to the child/adolescent psychiatric

unit at VBH.

139.    Upon further investigation, and after inspecting the patient intake sheets, Ms. Hartman discovered that Centra had been routinely refusing to accept transfers of patients with psychiatric emergencies when those patients met admission criteria.

140.    Centra maintains "careful consideration lists" that it uses to deny admission to patients in its psychiatric units.

141.    The careful consideration lists are kept secret and are not publicly disclosed.

142.    The careful consideration lists are effectively blacklists that are used to deny admission to patients on the basis of invalid exclusion criteria, such as: filing complaints against Centra or its employees, alleging human rights violations or filing human rights complaints, threatening litigation and merely having a diagnosis of autism.

143.    Ms. Hartman discovered that the careful consideration lists were being used to violate the EMTALA by refusing emergency treatment.

144.    Ms. Hartman notified Stephanie East and Michael Judd of the EMTALA violations by email.

145.    Ms. Hartman called the intake unit and directed staff in the intake unit to discontinue the EMTALA violations and to admit any emergency patients who met admission criteria as long as beds were available.

146.    Ms. Hartman ensured that the young patients she discovered had been refused emergency admission were located and transferred if they still required emergency psychiatric treatment. One of the patients had been transferred elsewhere, but the other patient was still languishing in an emergency room in Northern Virginia and was transported to VBH for treatment after Ms.

Hartman intervened.

147.   Ms. Hartman arranged for a meeting on June 5, 2019 that was attended by Stephanie East

and other Centra staff members.  The meeting was conducted at VBH in the executive

conference room from 1:00 p.m. to 2:00 p.m.  Michael Judd did not attend this meeting,

however, Stephanie East communicated with him during the meeting via text messaging.

148.   At the meeting, Ms. Hartman raised the EMTALA violations and the consequences they

had both in danger to patients and in liability to Centra.

149.   During the meeting, Amelia Perry, Intake Specialist, asked Stephanie East about the

existing policy denying admission to psychiatric patients without insurance and Amelia Perry

told Stephanie East that she did not "care if they have insurance or not."

150.   Stephanie East responded that the intake staff should deny patients without insurance and

to "internally, just move them to he bottom of the list and orient any new staff to do the same."

Stephanie East instructed the meeting participants not to document this policy.

151.   After the 1:00 p.m. meeting concluded, Stephanie East asked Ms. Hartman to remain for

a second meeting between Stephanie East, Michael Judd and Ms. Hartman.  Stephanie East

directed Ms. Hartman's student nurse, Megan Franklin, to leave the room.  Stephanie East

informed Ms. Hartman that the purpose of the meeting was to discuss Ms. Hartman's future with

Centra after Ms. Hartman completed her studies and became a nurse practitioner.

152.   The second meeting began at 2:00 p.m. in the executive conference room.

153.   Megan Franklin left the room as directed by Stephanie East and Michael Judd arrived.

154.   Michael Judd began the 2:00 p.m. meeting by advising Ms. Hartman that her email

messages regarding the EMTALA violations "could get circulated" and were "over the top, do

you know what I mean?"

155.    Ms. Hartman replied that she did not know what Michael Judd meant and asked him to explain what he meant.

156.    Michael Judd replied that "these things get around and we don't want them to."

157.    Stephanie East said that the email messages Ms. Hartman sent regarding the EMTALA violations were "manic and pressured."

158.    Ms. Hartman stated that she needed to stop the meeting because she would not participate in a cover-up of the EMTALA violations and that she wanted a representative of the human resources department to attend the meeting.

159.    Immediately after the meeting ended abruptly, Ms. Hartman was directed by Stephanie East not to return to her unit and to leave the hospital.

160.    Megan Franklin returned to the conference room and Stephanie East told Megan Franklin to go home.

161.    As Ms. Hartman walked to her car from leaving the 2:00 p.m. meeting, she received a text message from Stephanie East that was intended for the human resources department stating "Can I take her keys and badge now?"

162.    The 2:00 p.m. meeting was essentially a "shut up, or else" meeting.  The "else" was termination of Ms. Hartman's employment.

163.    On June 6, 2019, Ms. Hartman was notified by email that she had been terminated.  She was informed that she was not being terminated for cause and the email suggested a possible settlement.  The only action on Ms. Hartman's part mentioned in the email was her report of EMTALA violations.

164.    On June 6, 2019, after notifying Ms. Hartman by email that she had been terminated, three Centra security officers were dispatched to Ms. Hartman's home, where they pounded on her front door for more than half an hour and screamed that they were there to collect "Centra property."

165.    Ms. Hartman is enrolled in a program at Shenandoah University to become a nurse practitioner and she receives a scholarship through the Virginia Health Care Foundation.

166.    Shortly after being terminated by Centra, Ms. Hartman learned from Marian Newton, Assistant Dean for Advising, Retention and Progression at Shenandoah University that Stephanie East sent a disparaging email to the Provost and to a dean at Shenandoah University attempting to have Ms. Hartman disenrolled from the university by informing these university officials that Ms. Hartman was not permitted on Centra property and so would not be able to complete the practical component of her nursing education.

167.    Ms. Hartman was subsequently contacted by Denise Konrad, Director of Strategic Initiatives and Policy at the Virginia Health Care Foundation, a few weeks after she was terminated by Centra.  Ms. Konrad informed Ms. Hartman that Stephanie East sent Ms. Konrad an email informing her that Ms. Hartman had been terminated by Centra for cause.  Ms. Konrad notified Ms. Hartman and that Ms. Hartman's scholarship was in jeopardy as a consequence of the email.

168.    Stephanie East also retaliated against Ms. Hartman by defaming her to current Centra employees when Ms. East falsely reported to these employees that Ms. Hartman was mentally ill and that Ms. Hartman posed a risk of gun violence to these employees.

## CAUSES OF ACTION

## COUNT 1 – FEDERAL FALSE CLAIMS ACT VIOLATION

169.    Ms. Hartman, Ms. Bass and Ms. Woody, as Relators, incorporate and re-allege all of the foregoing allegations herein.

170.    By submitting false claims to Medicare and Medicaid, Centra falsely certified, explicitly or implicitly, its compliance with all laws, rules and regulations required for payment of the claims.

171.    By engaging in the acts set forth above, Centra, by and through its agents, officers and employees, in violation of the False Claims Act, 31 U.S.C. §§ 3729-3723, (i) knowingly presented or caused to be presented to the Government of the United States of America numerous false or fraudulent claims for payment or approval and (ii) knowingly made, used or caused to be made or used, false records or statements to obtain payment or approval of a false or fraudulent claim by the Government of the United States of America.

172.    The United States of America has been damaged as a result of Centra's violation of the False Claims Act in an amount to be proven at trial.

173.    The United States of America is entitled to treble damages due to Centra's violation of the False Claims Act.

174.    The United States of America is entitled to recover civil penalties in the minimum amount of $11,463 and in the maximum amount of $22,927 pursuant to 31 U.S.C. § 3729(a) for each violation of the False Claim Act by Centra.

175.    The Relators are entitled to a maximum of twenty-five percent and in any case no less than fifteen percent of any judgment obtained against Centra if the United States of America intervenes in this action.

176.    The Relators are entitled to a maximum of thirty percent and in any case no less than twenty-five percent of any judgment obtained against Centra if the United States of America declines to intervene in this action.

177.    Ms. Hartman, Ms. Bass and Ms. Woody, as Relators, are entitled to recover their reasonable attorney's fees and costs pursuant to 31 U.S.C. § 3730(d)(1).

### COUNT 2 – VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT

178.    Ms. Hartman, Ms. Bass and Ms. Woody, as Relators, incorporate and re-allege all of the foregoing allegations herein.

179.    Based upon the acts described above, Defendant knowingly violated one or more of the following:

- Knowingly presented, or caused to be presented to the Commonwealth of Virginia, a false or fraudulent claim for payment or approval;

- Knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Commonwealth of Virginia.

180.    The Commonwealth of Virginia, unaware of the falsity of these claims, records, and statements made by the Defendant, and in reliance on the accuracy thereof, paid money to Defendant and or the Defendant's agents or subsidiaries;

181.    The Commonwealth of Virginia and the general public have been damaged by the Defendant's violations of the Virginia Fraud Against Taxpayers Act.

182.    The Commonwealth of Virginia is entitled to treble damages due to Centra's violation of the Virginia Fraud Against Taxpayers Act pursuant to Code of Virginia § 8.01-216.3.

183.    The Commonwealth of Virginia is entitled to recover civil penalties in the minimum

amount of $11,463 and in the maximum amount of $22,927 pursuant to Code of Virginia § 8.01-216.3 for each violation of the Virginia Fraud Against Taxpayers Act by Centra.

184. The Relators are entitled to a maximum of twenty-five percent and in any case no less than fifteen percent of any judgment obtained against Centra if the Commonwealth intervenes in this action.

185. The Relators are entitled to a maximum of thirty percent and in any case no less than twenty-five percent of any judgment obtained against Centra if the Commonwealth declines to intervene in this action.

186. The Relators are entitled to recover their expenses, costs and reasonable attorney's fees in bringing forth this action.

## COUNT THREE – RETALIATION BY CENTRA AGAINST MS. HARTMAN FOR REPORTING FALSE CLAIMS ACT VIOLATIONS

187. Ms. Hartman incorporates and re-alleges all of the foregoing allegations herein.

188. Centra retaliated against Ms. Hartman by terminating her employment because she reported misconduct giving rise to False Claims Act violations to her superiors, including Stephanie East and Michael Judd.

189. Stephanie East, acting within the scope of her employment by Centra, further retaliated against Ms. Hartman after her termination of employment at Centra by maliciously and deliberately attempting to thwart or impede Ms. Hartman's education and career. Specifically, Stephanie East communicated with officials at Shenandoah University and the Virginia Health Care Foundation and provided the officials with false information (namely that Ms. Hartman had been fired by Centra for cause) in order to interfere with Ms. Hartman's studies at Shenandoah University and her scholarship from the Virginia Health Care Foundation.

190.    Ms. Hartman is entitled to all of the relief provided in by the False Claims Act, including reinstatement with the same seniority status that she held prior to her termination, two times the amount of her back pay, interest on her back pay, and compensation for any special damages sustained as a result of retaliation, including litigation costs and reasonable attorneys' fees.

## COUNT FOUR – RETALIATION BY CENTRA AGAINST MS. HARTMAN FOR REPORTING VIOLATIONS OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT

191.    Ms. Hartman incorporates and re-alleges all of the foregoing allegations herein.

192.    Centra retaliated against Ms. Hartman by terminating her employment because she reported misconduct giving rise to violations of the Virginia Fraud Against Taxpayers Act to her superiors, including Stephanie East and Michael Judd.

193.    Stephanie East, acting within the scope of her employment by Centra, further retaliated against Ms. Hartman after her termination of employment at Centra by maliciously and deliberately attempting to thwart or impede Ms. Hartman's education and career.  Specifically, Stephanie East communicated with officials at Shenandoah University and the Virginia Health Care Foundation and provided the officials with false information (namely that Ms. Hartman had been fired by Centra for cause) in order to interfere with Ms. Hartman's studies at Shenandoah University and her scholarship from the Virginia Health Care Foundation.

194.    Ms. Hartman is entitled to all of the relief provided in the Virginia Fraud Against Taxpayers Act, including reinstatement with the same seniority status that she held prior to her termination, two times the amount of her back pay, interest on her back pay, and compensation for any special damages sustained as a result of retaliation, including litigation costs and reasonable attorneys' fees.

## COUNT FIVE – RETALIATION BY CENTRA AGAINST MS. HARTMAN FOR REPORTING EMTALA VIOLATIONS

195.    The EMTALA provides that: "[a] participating hospital may not penalize or take adverse action against a qualified medical person described in subsection (c)(1)(A)(iii) or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or against any hospital employee because the employee reports a violation of a requirement of this section." 42 U.S.C. § 1395dd(i)

196.    Ms. Hartman was terminated by Centra because she reported EMTALA violations to her superiors, including Stephanie East and Michael Judd.

197.    Stephanie East, acting within the scope of her employment by Centra, further retaliated against Ms. Hartman after her termination of employment at Centra by maliciously and deliberately attempting to thwart or impede Ms. Hartman's education and career.  Specifically, Stephanie East communicated with officials at Shenandoah University and the Virginia Health Care Foundation and provided the officials with false information (namely that Ms. Hartman had been fired by Centra for cause) in order to interfere with Ms. Hartman's studies at Shenandoah University and her scholarship from the Virginia Health Care Foundation.

198.    Ms. Hartman is entitled to all the relief afforded by EMTALA,  including reinstatement with the same seniority status that she held prior to her termination, front pay, back pay, interest on her front pay and back pay, and compensation for any special damages sustained as a result of retaliation, including litigation costs and reasonable attorneys' fees.

## COUNT SIX – WRONGFUL TERMINATION (STATE COMMON LAW CLAIM) IN VIOLATION OF FEDERAL AND VIRGINIA STATUTES AND PUBLIC POLICY

199.   Ms. Hartman incorporates and re-alleges all of the foregoing allegations herein.

200.   Centra's termination of Ms. Hartman was unlawful and violated federal and state law as described above.

201.   Ms. Hartman's wrongful termination also violated public policy in two ways: by thwarting Ms. Hartman's effort to protect the public purse from fraud and by thwarting her effort to protect patients from being denied care to which they were entitled by law.

202.   Ms. Hartman is entitled to all of the relief provided by common law, including reinstatement with the same seniority status that she held prior to her termination, back pay, front pay, interest on her back pay, and compensation for any special damages sustained as a result of her wrongful termination, including litigation costs and reasonable attorneys' fees.

**WHEREFORE** with respect to Count One, the Relators, on behalf of themselves and the United States of America, request that this Court grant the following relief:

(a)   Judgment against defendant Centra Health, Inc. in an amount equal to three times the amount of damages the United States of America has sustained because of the defendant's actions, plus a civil penalty of $11,463 to $22,927 for each violation of 31 U.S.C. § 3729 and the costs of this action, with interest, including the costs of the United States of America and the Commonwealth of Virginia;

(b)   That the Relators be awarded all costs and expenses, including reasonable attorney's fees;

(c)   That in the event the United States of America intervenes in this action, the Relators be awarded 25%, but in no event less than 15% of the proceeds of the resulting judgment or settlement of this action;

(d)   That in the event the United States of America does not intervene in this action, the Relators be awarded 30%, but in no event less than 25% of the proceeds of the resulting judgment or settlement of this action;

(e)   That the Relators be awarded pre-judgment interest; and

(f)   That the United States of America and the Relators receive all such other legal and equitable relief as this Court deems appropriate.

**WHEREFORE** with respect to Count Two, the Relators, on behalf of themselves and the Commonwealth of Virginia, request that this Court grant the following relief to which they are entitled under the Virginia Fraud Against Taxpayers Act.

**WHEREFORE** with respect to Counts Three and Four, Relator Kimberly Hartman requests that this Court grant the following relief:

(a) That she be awarded all the relief to which she is entitled pursuant to 21 U.S.C. § 3730 (h), including personal injury damages for emotional and mental distress, two times her back pay, interest on back pay, front pay or reinstatement and her costs, expenses and reasonable attorney's fees; and

(b) Such other relief as this Court deems appropriate.

**WHEREFORE** with regard to Counts Five and Six, Relator Kimberly Hartman requests that this Court grant the following relief:

(a) Compensatory damages;

(b) Front pay, back pay, pre-judgment and post-judgment interest and her costs and reasonable attorney's fees incurred in bringing this action;

(c) Such other relief as this Court deems appropriate.

**A JURY TRIAL IS DEMANDED**

Respectfully submitted,

**KIMBERLY HARTMAN, ANNA BASS AND DEBRA WOODY**
**By Counsel**

**JAMES RIVER LEGAL ASSOCIATES**
**7601 Timberlake Road**
**Lynchburg, Virginia 24502**
**P (434) 845-4529**
**F (434) 845-8536**
**mvalois@vbclegal.com**

**By:** *Margaret C Valois*

for **M. Paul Valois, Esquire**
**Counsel for Relators**
**Virginia State Bar No. 72326**

*U.S. ex rels. Hartman, et al. v. Centra Health, Inc, ● Complaint ● Page 31 of 31*