CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

3/20/2024
LAURA A. AUSTIN, CLERK
BY:  s/ ARLENE LITTLE
       DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

UNITED STATES OF AMERICA
AND COMMONWEALTH OF VIRGINIA,
*ex rel.* KIMBERLY HARTMAN, ANNA
BASS, and DEBRA WOODY,

*Relators*,

v.

CENTRA HEALTH, INC.,

*Defendant.*

CASE NO. 6:19-cv-00053

MEMORANDUM OPINION
AND ORDER

JUDGE NORMAN K. MOON

     This case comes before the Court on Defendant Centra Health's motion to dismiss. Relators Kimberly Hartman (a former registered nurse at Centra), Anna Bass (same), and Debra Woody (an administrative assistant at Centra) brought this *qui tam* action, alleging that Defendant violated the False Claims Act ("FCA") and the Virginia Fraud Against Taxpayers Act ("VFTA").[1] The United States and Commonwealth of Virginia declined to intervene in the case, and now, Defendant seeks dismissal. For the following reasons, Defendant's motion to dismiss will be granted, in part, and denied, in part.

## BACKGROUND

     In their First Amended Complaint, Dkt. 5 (hereinafter "FAC"), Relators contend that Defendant Centra Health, Inc. committed fraud. Specifically, Relators aver that they have uncovered no less than seven independent, fraudulent schemes to dupe the United States and/or

---

[1] Relators also initially alleged that Centra retaliated against Relator Hartman for reporting violations of the FCA and VFTA. Dkt. 5 ¶¶ 151–58. However, Relators have since dropped those allegations. *See* Dkt. 27 at 3.

the Commonwealth of Virginia into paying Defendant money to which it was not entitled. The

following facts are alleged in Relators' First Amended Complaint and are assumed true for

purposes of resolving this motion. *See King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016)

(articulating the standard of review).

I.    <u>Scheme One</u>: Falsification of 15-Minute Observation Records

Relators first complain of Centra's "falsification" of "observation records in [the

company's] Acute Psychiatric Units" and the "cover-up of circumstances related to a patient

death" in one of those units. FAC ¶¶ 48–71. Relators contend that at each of the "secure acute

psychiatric units at [Virginia Baptist Hospital], 15-minute observations are required of each

patient." *Id.* ¶ 48. These observations are "necessary to protect patients from harm," and relevant

here, they are "paid for by Medicare and Medicaid for patients who are beneficiaries of those

programs upon claims for payment submitted by Centra." *Id.*

In their First Amended Complaint, Relators describe a January 2019 incident where

records concerning 15-minute observations were allegedly falsified in the face of a patient's

death. "While covering as Unit Manager," one of Centra's employees asked to speak with

Relator Hartman; when they spoke, the employee told Hartman that she had "found a female

patient [at Virginia Baptist Hospital] unconscious on the floor lying in a pool of coffee-colored

blood." *Id.* ¶¶ 53–55. The patient was transported to Lynchburg General Hospital but was

pronounced dead soon after arrival. *Id.* ¶ 55. Relators aver that Hartman, in response, "reviewed

the security camera [footage] from the night of the incident to determine whether the mandatory

fifteen-minute bed checks occurred and to see if there were any other medical issues that

occurred during the night." *Id.* ¶ 57. On the footage, she observed the certified nursing assistant

("CNA"), who was assigned to perform bed checks, "sitting in the hallway for hours not

2

performing bed checks the morning of the patient's death;" the CNA also reportedly "falsified

the patient records to reflect that the mandatory bed checks had been completed."[2] *Id.* ¶¶ 58–61.

Notably, Relators contend that the falsification of 15-minute observation records was not

limited to the January 2019 incident. After the incident, Hartman reportedly "consulted with staff

in the [affected] unit and was informed that the staff did not have the time to conduct the

15-minute observations, so they routinely falsified them and had been doing so for years." *Id.*

¶ 62. Relator Bass also claims to have "personally observed the staff charged with performing

the 15-minute observations … routinely sleeping or spending time at the computer watching

videos and then falsifying the observation records." *Id.* ¶¶ 67–68.

Consequently, Relators conclude that, "for years, Centra billed Medicaid and Medicare

(and other government and private insurers) for falsified 15-minute observations for every

patient in each of the psychiatric units." *Id.* ¶ 71. Relators contend that Centra "knowingly

submitted false claims to receive payment for these services that it knew were not being

provided" and that "[t]hese falsifications were material [because] when Centra submitted them to

Medicaid and Medicare for payment, Centra certified, either explicitly or implicitly, that the

15-minute observations had been conducted." *Id.* Centra was supposedly paid as a result of these

false statements. *Id.*

## II.    <u>Scheme Two</u>: Falsification of Joint Commission Hourly Audit Reports

In Scheme Two, Relators allege that Centra falsified audit reports in order to "maintain[]

accreditation of its acute psychiatric units." FAC ¶ 87. An organization known as the Joint

Commission is responsible for accrediting medical facilities, including facilities owned by

---

[2] The Court notes that Relators *do not allege* that these particular "falsified … patient records" were submitted as part of a claim to the government. *Id.* ¶ 61.

Centra. *Id.* ¶¶ 72–73. In 2018, the Joint Commission determined that three of Centra's acute psychiatric units were unsafe and, as a result, did not meet the criteria for accreditation. *Id.* ¶¶ 74–75. Despite this finding, the Joint Commission opted not to revoke Centra's accreditation. Instead, the Joint Commission and Centra "agreed to a plan whereby Centra would correct the [deficiencies] in a timely manner and would maintain accreditation" by conducting hourly audits of the problematic units. *Id.* ¶ 76.

Nonetheless, after the adoption of this plan, Relator Hartman learned that Centra's staff were falsifying the Joint Commission hourly audits. *Id.* ¶ 78. Hartman allegedly brought the issue to the attention of her superiors. *Id.* ¶ 80. But her superiors blew her off, suggesting that the staff "*should* falsify the hourly audits;" in fact, one superior supposedly "suggested [a] method of falsifying the hourly audits in a manner that would evade detection by the Joint Commission." *Id.* ¶¶ 81–83 (emphasis added).

Relators maintain that "[i]f the Joint Commission had discovered that Centra had falsified the audits or that it had not conducted them as agreed, the Joint Commission would have revoked the accreditation of the acute psychiatric units." *Id.* ¶ 87. And as Relators point out, accreditation is "a necessary condition for participation in both Medicare and Medicaid." *Id.* ¶ 89. Relators, therefore, posit that when Centra "submitted claims to Medicaid and Medicare for payment for the care of patients in [its] psychiatric units, [it] falsely certified, either explicitly or implicitly, that it cooperated with the accreditation requirements of the Joint Commission, when in reality it was flagrantly, actively and unlawfully thwarting oversight." *Id.* ¶ 92.

### III.   <u>Scheme Three</u>: Falsification of Employee Credentials to Obtain Grant Funding

Relators next accuse Centra of falsifying employee credentials to obtain grant funding. In 2015, Centra executed a memorandum of understanding ("MOU") with a local community

services board; in it, the parties stated their intent to establish a psychiatric emergency center in Lynchburg, Virginia. FAC ¶¶ 94–96. As a part of the MOU, the community services board agreed to submit a grant application for the project to the Virginia Department of Behavioral Health and Developmental Services ("VDBHDS"). *Id.* ¶ 94. In return, Centra promised to "design and construct [the psychiatric emergency center] and … comply with all applicable federal and state statutes, regulations and policies, including Medicaid regulations." *Id.* ¶ 96. Relevant here, Centra also agreed to "provide qualified and properly credentialed staff." *Id.* ¶ 97.

However, "[i]n disregard [of] the agreement, [Centra supposedly] staffed the [center] with employees who lacked the necessary credentials."[3] *Id.* ¶ 97. And this decision allegedly had deadly consequences. In 2016, a patient was shot by an armed Centra security guard, resulting in numerous investigations. *Id.* ¶ 100. To thwart the investigations, the director and unit manager of the psychiatric emergency center apparently "falsified several credentials of the [center's] employees and presented the falsified credentials to investigators." *Id.* ¶ 101.

Relators, accordingly, allege that by failing to staff the center with properly credentialed employees, Centra "knowingly submitted false claims for payments that were funded by proceeds from the [Commonwealth of Virginia's] grant for the [center]" and that, as a result, "Centra received proceeds of the [grant] … to which it was not entitled." *Id.* ¶¶ 102–03. Put differently, Relators believe that in violating the MOU with the community services board, Centra submitted false claims to the Commonwealth of Virginia.

## IV.   <u>Scheme Four</u>: Billing Medicaid and Medicare for Services Not Provided

In Scheme Four, Relators assert that "Centra employees and agents routinely billed Medicaid and Medicare for services that were not provided." FAC ¶ 104. In support of this broad

---

[3] Notably, Relators do not identify which employees lacked the appropriate credentials.

proposition, Relators focus on one doctor—Dr. Lisa Johnson. Dr. Johnson "provided services in the child/adolescent psychiatric unit at [Virginia Baptist Hospital] in 2017 and 2018." *Id.* ¶ 105. Specifically, Relators complain that during her employment, Dr. Johnson "billed for services she did not provide," including "patient histories that were never taken or documented," "patient discharge summaries that were never completed," and "patient assessments that were never made." *Id.* ¶ 106. She also allegedly "falsified clinical information for many patients with Medicaid in order to needlessly extend their stays and in order to falsely bill Medicaid and other insurance providers for unnecessary services." *Id.* ¶ 107. Supposedly, Dr. Johnson's superiors were aware of her "falsification of records and the consequent overbilling." *Id.* ¶ 108. Nonetheless, they allowed it to happen. Relators maintain that Dr. Johnson's actions "necessarily led to the submission of false Medicaid and Medicare claims that were paid to Centra." *Id.* ¶ 109.

Moreover, Relators attest that Dr. Johnson was not the only Centra doctor overbilling Medicaid and Medicare. They claim that "[o]ther Centra physicians [also] routinely falsified the amount of time they devoted to consultations, frequently billing for 30 minute consultations when they did not conduct any consultation at all or when they actually spent less than 5 minutes in consultation." *Id.* ¶ 110.

Significantly, Relators provide *nine specific examples* of "false claims submitted for consultations." *Id.* And for each of the nine examples, Relators identify the patient (by their initials), the patient's age, and the date of treatment. *Id.* Relators intimate that Centra "received payment from Medicare and Medicaid programs to which it was not entitled as a result of the submission" of these specific false claims. *Id.* ¶ 112.

## V.     Scheme Five: Overbilling for Psychiatric Consultations

Fifth, Relators aver that Centra "regularly overbilled for psychiatric consultations in each of the three psychiatric units at [Virginia Baptist Hospital]." FAC ¶ 113. They posit that "[p]hysicians and other caregivers routinely falsified records [and] exaggerate[d] the amount of time they spent in consultations." *Id.* ¶ 113. Due to these misrepresentations, Centra supposedly "submitted false claims to Medicaid and Medicare." *Id.*

Relators further allege that "family members routinely complained to Centra's staff," but "Centra swept these complaints under the rug and continued to bill Medicare and Medicaid for these false claims." *Id.* ¶ 114. Relators claim that security recordings from each of Centra's psychiatric units "will demonstrate the actual duration of patient consultations and so will prove that Medicare and Medicaid were being overbilled." *Id.* ¶ 115.

## VI.    Scheme Six: Manipulating Patient Lengths of Stay in Psychiatric Units

In Scheme Six, Relators contend that, due to financial pressures, Centra's management instructed subordinates to "manipulate lengths of stay in the [psychiatric] units to maximize payment by both government and private insurance companies." FAC ¶ 116–17. In particular, one manager apparently outlined two strategies "to create the records necessary to get … false [insurance] claims paid," *id.* ¶ 119: (1) she "directed her staff to presume that … patients had … a plan" of harming themselves or others, and (2) she instructed her staff "to use suggestive language when interviewing … patients," *id.* Supposedly, these two strategies created the paper trail necessary to improperly charge patients' insurance providers.[4]

---

[4] The Court notes that Relators' allegations lack many details. For instance, Relators do not explain how these two strategies led to the submission of false claims by Centra. Nor do they disclose what "suggestive language" was used by Centra's employees or describe why presuming that patients have a plan of harming themselves or others is inappropriate. *Id.* ¶ 119.

In addition, Centra allegedly treated patients differently based on their insurance coverage. Because Medicare and Medicaid generally paid for longer stays in Centra's psychiatric units, Centra "extend[ed] stays for [Medicare and] Medicaid patients as long as possible." *Id.* ¶ 120. By contrast, Anthem patients were not covered for more than four days, so Centra "reduc[ed] lengths of stay for Anthem patients to four days or less." *Id.* "Centra … [also] maintained a policy of discharging uninsured patients immediately." *Id.* In short, Relators allege that Centra's "employees … needlessly extend[ed] the stays of Medicaid patients while prematurely discharging Anthem patients to maximize revenue." *Id.* ¶ 121.

**VII.**    **Scheme Seven: Fraudulent Billing for Adult Patients Unlawfully Treated in the Child and Adolescent Psychiatric Unit and Juvenile Patients Unlawfully Treated in the Adult Unit**

Finally, Relators complain that Centra "used [an] unlawful policy to bilk Medicare and Medicaid out of payment for services that were never provided."[5] FAC ¶ 126. "Centra's psychiatric units are licensed by" VDBHDS—a state agency "whose regulations prohibit licensed facilities from treating adults in juvenile psychiatric facilities and from treating juveniles in adult facilities." *Id.* ¶ 123.

Nevertheless, Centra allegedly flaunted VDBHDS's regulations.[6] Centra "promulgated and operated under a formal policy that allowed some adults to be treated in the Child and Adolescent Psychiatric Unit and also allowed some children to be treated in the Adult Psychiatric Unit."[7] *Id.* ¶ 124. The alleged reason: Centra is supposedly "paid more by Medicare and

---

[5] Relators do not identify the "services that were never provided." FAC ¶ 126.

[6] Centra falsely claimed to have obtained a "variance" from state regulators that would allow them to violate VDBHDS's regulations. *Id.* ¶ 125. However, Relators point to email correspondence between Centra and state regulators, showing that there was no such variance. *Id.*; *see also* FAC (Ex. D).

[7] Specifically, Centra was admitting "17 year olds to the Adult Inpatient service" and "18 year olds to the Children's Inpatient service" in violation of state regulations. FAC (Ex. E).

Medicaid to treat juvenile psychiatric patients than adult patients." *Id.* ¶ 127. Thus, Relators believe that Centra "admit[ted] adult patients into the [juvenile] unit and then bill[ed] Medicare and Medicaid at the higher rate for juvenile psychiatric care for these adult patients" while, at the same time, "admitting juvenile patients in the Adult Psychiatric Unit and then [still] billing Medicare and Medicaid at the higher rate." *Id.* ¶¶ 128–29. In other words, Relators allege that Centra "knowingly submitted false claims for payment to Medicare and Medicaid for juvenile psychiatric care to adult patients" and "for juvenile psychiatric care to juvenile patients who received … care in the Adult Psychiatric Unit." *Id.* ¶¶ 131–32.

### Standard of Review

"A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the claims pled in a complaint." *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019). It does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King*, 825 F.3d at 214. Rather, it ascertains whether a complaint "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Significantly, to survive a 12(b)(6) motion, a complaint "does not need detailed factual allegations, [but] a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief [does] require[ ] more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

When "alleging fraud or mistake," however, a plaintiff must not only meet "the plausibility standard of" Rule 12(b)(6), but they must also satisfy the heightened pleading standard of Rule 9(b). *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting Fed. R. Civ. P. 9(b)). Specifically, "Rule 9(b) requires a plaintiff alleging fraud or mistake, like a False Claims Act relator, to 'state with particularity the circumstances constituting fraud or mistake,' though knowledge may be alleged generally"—i.e.,

the "who, what, when, where, and how" of the alleged fraud. *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting Fed. R. Civ. P. 9(b)). Put differently, a plaintiff "must, at a minimum, describe the time, place, and contents of the false representation, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Nathan*, 707 F.3d at 455–56 (internal quotation marks omitted). Nevertheless, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

## DISCUSSION

Because the FCA sounds in fraud, to survive Defendant's motion to dismiss, Relators must not only overcome Rule 9(b)'s particularity requirement but also the FCA's gatekeeping mechanisms. Most—but not all—of Relators' categories of false claims fail to vault these hurdles. Indeed, the Court will hold that only Scheme Four—a scheme focusing on a particular doctor and specific false claims—will (partially) survive Defendant's motion to dismiss.

In general, an FCA relator must allege with particularity that: (1) "'there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due.'"[8] *Boyko*, 39 F.4th at 188 (quoting *Harrison*, 176 F.3d at 788) (interpreting 31 U.S.C. § 3729(a)(1)(A)); *see also* Fed. R. Civ. P. 9(b).

---

[8] Notably, the "similarity of the language of the [FCA and VFTA] makes it clear that the Virginia General Assembly intended to pattern the VF[]TA after the FCA." *See United States ex rel. Johnson v. Univ. Health Servs., Inc.*, 889 F. Supp. 2d 791, 793 (W.D. Va. 2012); *see also Lewis v. City of Alexandria*, 756 S.E.2d 465, 469 n.4 (Va. 2014). Accordingly, "federal courts in Virginia apply the [FCA's] standard to VF[]TA claims." *United States v. Ndutime Youth & Fam.*

Turning first to the FCA's scienter—or mental state—requirement, a plaintiff must aver that a defendant acted knowingly. *Harrison*, 176 F.3d at 785 (interpreting 31 U.S.C. § 3729(a)(1)(A)). By statute, "the terms 'knowing' and 'knowingly' mean that a person, with respect to information—(i) ha[d] actual knowledge of the information; (ii) act[ed] with deliberate ignorance of the truth or falsity of the information; or (iii) act[ed] in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b) (cleaned up). Significantly, "no proof of specific intent to defraud is required," *id.*, and "knowledge[] and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b).

In addition, "liability under the Act attaches only to a [false or fraudulent] *claim actually presented* to the government for payment, not to the underlying fraudulent scheme." *Nathan*, 707 F.3d at 456 (emphasis added) (citing *Harrison*, 176 F.3d at 785). It follows that courts normally require "some indicia of reliability … that an actual false claim was presented to the government." *Nathan*, 707 F.3d at 457 (cleaned up). A relator has two options to satisfy this requirement: they may (1) "describe 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby,'" *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (quoting *Harrison*, 176 F.3d at 784), or (2) allege "a pattern of conduct that would '*necessarily* have led[ ] to submission of false claims' to the government for payment," *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 197 (4th Cir. 2018) (quoting *Nathan*, 707 F.3d at 457).

---

*Servies, Inc.*, No. 3:16-cv-653, 2020 WL 5507217, at *15 (E.D. Va. Sept. 11, 2020). Indeed, both parties assume that the FCA and VFTA analyses are indistinguishable. Dkts. 26, 27, 28. The Court will, consequently, treat the FCA and VFTA as interchangeable.

Finally, "[l]iability under … the False Claims Act is subject to the further, judicially-imposed, requirement that the false statement or claim be material." *Harrison*, 176 F.3d at 785. Because the FCA "is not 'an all-purpose antifraud statute,'" this requirement is "rigorous" and "demanding." *United Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192–94 (2016) (quoting *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 672 (2008)). The FCA defines "the term 'material' [as] having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). A misrepresentation is not material "merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient … that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Escobar*, 579 U.S. at 194 (citation omitted). Rather, the violation "must be 'so central' to the services provided that the Government 'would not have paid these claims had it known of these violations.'" *Boyko*, 39 F.4th at 190 (quoting *Escobar*, 579 U.S. at 196). For example, "allegations 'that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement' can establish materiality." *Boyko*, 39 F.4th at 191 (quoting *Escobar*, 579 U.S. at 195).

In broad strokes, Defendant contends that Relators have failed to plead their allegations of fraud with particularity and that, even if they had, Relators also neglected to sufficiently allege materiality or the requisite mental state under the FCA. *See* Dkt. 26 at 1–2. Defendant is partially correct. The Court concludes that six of the seven alleged schemes fail to state a claim for relief because (1) Relators did not satisfy Rule 9(b)'s particularity requirement, (2) Relators did not adequately plead the presentment of false claims to the government, and/or (3) Relators did not

sufficiently plead the materiality of Defendant's false claims. But the Court finds that one scheme—Scheme Four—stated a claim for relief since it concentrated on a particular doctor and specific false claims which were necessarily billed to the government.

I.     **The Court will grant Defendant's motion to dismiss as to six of Relators' alleged categories of false claims.**

   a.   *The Court concludes that Scheme One—i.e., Defendant's purported falsification of 15-minute observation records—fails to state a claim because, inter alia, Relators neglected to plead that Defendant presented false claims to the government.*

Relators' allegations fall into two categories: (1) contentions that Defendant had a practice of billing Medicaid and Medicare on the basis of falsified 15-minute observation records and (2) assertions that, in relation to one incident, Defendant falsified 15-minute observation records. Neither category states a claim for relief.

Turning to the first group of allegations, the Court will dismiss Relators' generalized claim that "for years, Centra billed Medicaid and Medicare (and other government and private insurers) for falsified 15-minute observations for every patient in each of the psychiatric units." FAC ¶ 71. Putting aside the alleged falsification of 15-minute observation records during the January 2019 incident, the First Amended Complaint merely alleges, in conclusory terms, that Defendant has *consistently* submitted "falsified 15-minute observations for every patient in each of the psychiatric units." *Id.* ¶ 71. Indeed, Relators provide only one allegation to support their claim of pervasive fraud: specifically, one Relator alleges that they "personally observed the staff charged with performing the 15-minute observations in the Adult Psychiatric Unit routinely sleeping or spending time at the computer watching videos and then falsifying the observation records." *Id.* ¶ 68. But that nonspecific contention—standing alone—cannot satisfy Federal Rule of Civil Procedure 9(b)'s particularity requirement. Relators have neither "describe[d] the time,

place, and contents of [any] false representation" nor "the identity of the person making the misrepresentation and what he obtained thereby." *Nathan*, 707 F.3d at 455–56 (internal quotation marks omitted). Relators' generalized and conclusory claim, therefore, must fail.

Relators' allegations involving the January 2019 incident, where records concerning 15-minute observations were allegedly falsified in the face of a patient's death, present a closer question; nevertheless, those contentions also fail to state a claim for relief. *See* FAC ¶¶ 52–66. True, Relators have alleged with particularity that one of Centra's employees "falsified … patient records"—conduct that undoubtedly constitutes fraud. *Id.* ¶ 59. In fact, they spend fifteen paragraphs of their First Amended Complaint describing the incident. *See id.* ¶¶ 52–66. Yet, in those fifteen paragraphs, there is a material omission. There is no mention that the "falsified … patient records" at issue were ever presented—in any form—to the government for payment.[9] *Id.* ¶ 59. And that is significant: as the Fourth Circuit has explained, FCA liability attaches solely to fraudulent claims presented to the government. *Nathan*, 707 F.3d at 456. Describing a "private [fraud] scheme in detail" is not enough. *Id.* at 457.

As discussed above, there are two ways to allege presentment under the FCA—a litigant (1) may "describe 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby,'" *Wilson*, 525 F.3d at 379 (quoting *Harrison*, 176 F.3d at 784), or (2) allege "a pattern of conduct that would '*necessarily* have led[ ] to submission of false claims' to the government for payment," *Grant*, 912 F.3d at 197 (quoting *Nathan*, 707 F.3d at 457).

---

[9] The Court notes that Relators' allegations of pervasive fraud in Defendant's psychiatric units suffer from the same deficiency.

Relators have done neither. Notwithstanding Relators' conclusory allegation that "Centra billed Medicaid and Medicare (and other government and private insurers) for falsified 15-minute observations for every patient in each of the psychiatric units," FAC ¶ 71, Relators have pointed to no particularized averments tending to provide "'some indicia of reliability' … that [the deceased's particular falsified patient records were] presented to the government,"[10] *Nathan*, 707 F.3d at 457 (quotation omitted).

Nor have Relators adequately alleged "a pattern of conduct that would '*necessarily* have led[ ] to submission of false claims' to the government for payment." *Grant*, 912 F.3d at 197 (quoting *Nathan*, 707 F.3d at 457). Relators have not provided any "explanation of [Defendant's] billing structure or how or whether" all patient records were submitted to the government for payment. *Grant*, 912 F.3d at 198. Thus, Relators' First Amended Complaint "leaves open the possibility that the government was not billed for and accordingly never paid for the particular alleged fraudulent" patient records. *Id.* That will not do—it is insufficient to "allege simply and without any stated reason … that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Nathan*, 707 F.3d at 457 (internal quotation marks and citation omitted). As a result, Relators' specific allegations regarding the falsification of records in relation to the patient's death in January 2019 also must be dismissed. In sum, Scheme One fails to state a claim for relief under the FCA.

      **b.   *The Court will dismiss Scheme Two—i.e., Defendant's falsification of Joint Commission hourly audits—due to Relators' failure to plead materiality.***

Relators next contend that Centra falsified hourly audit reports in order to "maintain[] accreditation of its acute psychiatric units," FAC ¶ 87—"a necessary condition for participation

---

[10] Notably, Relators' cursory response brief does not address this category of false claims. *See* Dkt. 27.

in both Medicare and Medicaid," *id.* ¶ 89; however, the FCA's materiality requirement dooms Relators' claim. In their First Amended Complaint, Relators have *not alleged any facts* tending to show that Defendant's noncompliance with its accreditation obligations is material. *See id.* ¶¶ 72–92. Rather, Relators appear to rely solely on the contention that "provid[ing] false information regarding a condition of participation in Medicaid and Medicare"—by itself—is sufficient to make a misrepresentation material. Dkt. 27 at 2.

But a misrepresentation is not material "merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Escobar*, 579 U.S. at 194 (citation omitted). Instead, the false information "must be 'so central' to the services provided that the Government 'would not have paid the[] claims had it known of the[] violations.'" *Boyko*, 39 F.4th at 190 (quoting *Escobar*, 579 U.S. at 196). Notably, a relator must allege enough facts to meet this "demanding" standard. *Escobar*, 579 U.S. at 194.

Relevant here, the Fourth Circuit has previously rejected claims akin to those advanced by Relators. For example, in *United States ex rel. Taylor v. Boyko*, 39 F.4th 177 (4th Cir. 2022), the relator claimed that the defendant violated "two Medicare regulations" by continuing "to bill Medicare while failing to disclose [the defendant's] administrative dissolution and revoked certificate of authorization." *Id.* at 190. Attempting to satisfy the FCA's materiality requirement, the relator cited administrative decisions, demonstrating that the government often rejects claims by individual doctors who lost their personal medical licenses. *Id.* at 191–92. However, in scrutinizing the relator's assertion of materiality, the Court distinguished between individual medical licenses, on the one hand, and corporate certificates of authorization, on the other. *Id.* The Court explained that while a personal medical license might be material to a claim for payment, a corporate certificate of authorization was not material. *Id.* Therefore, despite the

relator putting forward some evidence in support of materiality, the Fourth Circuit nevertheless determined that she had not adequately pled that the defendant's lack of a certificate of authorization was "'so central' to the medical services provided [by the defendant] that the 'Medica[re] program would not have paid [defendant's] claims had it known of [its] violations.'" *Id.* at 193 (quoting *Escobar*, 579 U.S. at 196).

In the present matter, Relators have an even weaker case than the relator in *Boyko*. The relator in *Boyko* presented some—albeit ineffectual—allegations of materiality, but here, Relators have submitted none.[11] And that is dispositive. Without any allegations of materiality, the Court cannot conclude that Relators have plausibly alleged—let alone alleged with particularity[12]—that the government would not have paid Defendant had it known of Defendant's allegedly fraudulent activity. At bottom, Relators have simply ignored the FCA's materiality requirement. Accordingly, Relators' allegations regarding the falsification of Joint Commission hourly audits fail to state a claim upon which relief can be granted.

---

[11] The Court also notes that Relators' claim is more attenuated than the one in *Boyko*. There, it was undisputed that the company at issue did not have a license to do business. 39 F.4th at 186–87. By contrast, here, Relators do not argue that Defendant is not accredited; rather, they contend that Defendant only maintained its accreditation through fraud. FAC ¶ 87. In other words, Relators complain that Defendant provided false information to a private party—the Joint Commission—to maintain a necessary condition for government payment—accreditation. Significantly, they do not allege that Defendant submitted false information to the government.

[12] *Boyko*, 39 F.4th at 190 (noting that "[m]ateriality, like other non-scienter elements of a False Claims Act claim, must be pleaded with particularity under Rule 9(b)").

### c. The Court will dismiss Scheme Three—i.e., Defendant's falsification of employee credentials to obtain grant funding—along the same lines as Scheme Two.

Like Scheme Two, Relators ignore the VFTA's materiality requirement and, accordingly, fail to state a claim upon which relief can be granted in Scheme Three.[13] Again, Relators have not averred that Defendant's allegedly fraudulent conduct is "'so central' to the services provided that the Government 'would not have paid these claims had it known of these violations.'" *Boyko*, 39 F.4th at 190 (quoting *Escobar*, 579 U.S. at 196). Relators merely state that "[a]s a result of failing to staff the [psychiatric emergency center] with employees who are properly credentialed and by falsifying the credentials of these employees to thwart the investigation of the shooting inside the [center], Centra knowingly submitted false claims for payments that were funded by proceeds from" a state grant. FAC ¶ 102.

Relators' generalized and conclusory claim of materiality is insufficient. To be sure, falsifying the credentials of certain kinds of employees might necessarily be material to government payment. For instance, "[c]ommon sense tells us that a personal medical license would probably be 'central' to the provision of medical services, and by extension, Government payments for such services." *Boyko*, 39 F.4th at 193 (citation omitted). But in the present matter, Relators have not specified which employees—by name, position, or profession—"lacked the necessary credentials;" nor have they explained how a lack of credentials was relevant to government payment.[14] FAC ¶ 99; *see also Boyko*, 39 F.4th at 189.

---

[13] Even though Relators' credentialing claim arises under the VFTA rather than the FCA, as mentioned above, the analysis is largely identical. *See supra* note 8.

[14] The Court notes that Defendant never contracted with the Commonwealth of Virginia to provide properly credentialed employees, so to the extent Defendant is obligated, by contract, to supply properly credentialed employees, it is obligated to a private party—Horizon Behavioral Health. FAC ¶ 96. This fact further undermines any claim of materiality under the VFTA.

Simply put, Relators have not alleged—let alone alleged with particularity—that a lack of proper employee credentials would have caused Defendant to lose grant funding. *See Boyko*, 39 F.4th at 190. It follows that Relators have not properly alleged materiality—a required element to state a claim under the VFTA. The Court will, thus, dismiss Relators' claims arising under Scheme Three.

> **d.   The Court will dismiss Scheme Five—*i.e.*, Defendant's alleged overbilling for psychiatric consultations—for failing to satisfy Federal Rule of Civil Procedure 9(b)'s particularity requirement.**

In Scheme Five, Relators posit that Defendant "regularly overbilled for psychiatric consultations in each of [its] three psychiatric units at [Virginia Baptist Hospital]." FAC ¶ 113. Even if Relators' allegations are "plausible," *see Iqbal*, 556 U.S. at 678, they fail to "satisfy the heightened pleading standard of [Federal] Rule [of Civil Procedure] 9(b)," *Nathan*, 707 F.3d at 455. As mentioned above, Rule 9(b) requires a plaintiff (or relator), who is alleging fraud or mistake, to, "at a minimum, describe the time, place, and contents of the false representation, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Id.* at 455–56 (internal quotation marks omitted).

Here, Relators have not identified who perpetrated the supposed fraud or when the fraud occurred—omissions which doom Scheme Five. Indeed, instead of identifying a specific doctor, Relators vaguely point to "[p]hysicians and other caregivers" as the responsible parties. FAC ¶ 113. And instead of identifying the specific timeframe when the fraud allegedly took place, they merely contend that it occurred "regularly." *Id.*

This will not do; Relators' recitation of Scheme Five is devoid of "'specific facts that support an inference of fraud.'" *Wilson*, 525 F.3d at 379 (quoting *U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 385 (5th Cir. 2003)). Put differently, their allegations

are simply too general and conclusory. As a result, because a "lack of compliance with Rule

9(b)'s pleading requirements is treated as failure to state a claim under Rule 12(b)(6)," the Court

will dismiss allegations relating to Scheme Five for failure to state a claim. *Dunn v. Borta*, 369

F.3d 421, 426 (4th Cir. 2004) (quoting *Harrison*, 176 F.3d at 783 n.5).

### e. *The Court will also dismiss Scheme Six—i.e., Defendant's manipulation of patient lengths of stay—pursuant to Rule 9(b).*

In Scheme Six, Relators aver that, due to financial pressures, Defendant's management

instructed subordinates to "manipulate lengths of stay in [its psychiatric] units to maximize

payment by both government and private insurance companies." FAC ¶ 116–17. Once again,

Relators' contentions are too general to satisfy Rule 9(b)'s particularity requirement. As

mentioned above, "a [relator] asserting a claim under the [FCA] must, at a minimum, describe

the time, place, and contents of the false representations, as well as the identity of the person

making the misrepresentation and what he obtained thereby." *Nathan*, 707 F.3d at

455–56 (cleaned up).

Here, Relators' allegations of fraud fail for—at least—two reasons: (1) Relators do not

allege when Defendant's fraud took place and (2) Relators have not specified the contents of

Defendant's alleged false claims. First, in attempting to explain when Defendant's allegedly

fraudulent conduct occurred, Relators rely almost entirely on conclusory allegations. Relators

explain that "[i]n early 2019, [Defendant] was in poor financial condition." FAC ¶ 116. And they

imply that Defendant's alleged fraud was tied to its financial hardship, stating that, supposedly in

response to Defendant's financial difficulties, Defendant's managers "pressured subordinates to

manipulate lengths of stay in the [psychiatric] units to maximize payment by both government

and private insurance companies." *Id.* ¶ 117. However, Relators' only point to "evidence" of

misconduct from nearly ten years prior—an employee's minute notes from 2010. *Id.* ¶ 118. Thus,

although Relators claim that the practice "was a longstanding one," it is unclear when—if ever—Defendant's purported fraud occurred. *Id.* Such vague allegations, bookending a decade, fall far short of the requisite particularity. *See Wilson*, 525 F.3d at 379.

More damning, Relators have not described the contents of Defendant's false claims. At a high level, Relators criticize Defendant for "needlessly extending the stays of Medicaid patients while prematurely discharging Anthem patients to maximize revenue." FAC ¶ 121. But they do not articulate how Defendant did so. True, Relators complain about doctors "presum[ing] that … patients[, who indicated that they might harm themselves at home, actually] had … a plan of harming themselves or others." *Id.* ¶ 118–19. But they do not explain how this presumption is unreasonable, let alone how it generated false claims. In short, Relators appear displeased with how Defendant is treating psychiatric patients and have, accordingly, turned to the FCA to air their grievances. But the FCA provides no remedy for such complaints. As Defendant points out, "FCA liability cannot attach to … 'scientific judgments or statements as to which reasonable minds may differ.'" Dkt. 26 at 13 (quoting *U.S. ex rel. Hill v. Univ. of Med. & Dentistry of New Jersey*, 448 F. App'x 314, 316 (3d Cir. 2011)); *see also U.S. ex rel. Milam v. Regents of Univ. of California*, 912 F. Supp. 868, 886 (D. Md. 1995) (noting that "[d]isagreements over scientific methodology do not give rise to False Claims Act liability").

In sum, because Relators have not described Scheme Six with the required specificity, the Court will dismiss claims relating to Scheme Six.

> **f.   Finally, the Court will dismiss Scheme Seven—i.e., Defendant's supposedly improper billing for adult patients treated in juvenile psychiatric facilities and juvenile patients treated in adult psychiatric facilities—along similar lines to Scheme Six.**

Like Scheme Six, Relators' contentions in Scheme Seven are too general to satisfy Rule 9(b)'s particularity requirement. Specifically, they do not "describe the time … of the false

representation [or] the identity of the person making the misrepresentation and what he obtained

thereby." *Nathan*, 707 F.3d at 455–56 (internal quotation marks omitted). Indeed, Relators' First

Amended Complaint is devoid of assertions regarding *when* Defendant "knowingly submitted

false claims for payment to Medicare and Medicaid for juvenile psychiatric care to adult

patients" and "for juvenile psychiatric care to juvenile patients who received … care in the Adult

Psychiatric Unit." FAC ¶¶ 131–32. In addition, Relators do not identify *who* made the purported

false claims to the government.[15] They simply state that, "[u]pon information and belief,

[Defendant] … bill[ed] Medicare and Medicaid at the higher rate for juvenile psychiatric care

for" certain adult patients as well as juvenile patients. *Id.* ¶ 128. As a result of these defects,

Relators' allegations fall short of Rule 9(b)'s demands and, consequently, must be dismissed.

Moreover, Scheme Seven is deficient for an additional reason—it fails to address the

FCA's materiality requirement. To meet the FCA's "rigorous" and "demanding" materiality

standard, *Escobar*, 579 U.S. at 192–94, a relator must allege with particularity that a defendant's

misrepresentation was "'so central' to the services provided that the Government 'would not

have paid these claims had it known of these violations.'" *Boyko*, 39 F.4th at 190 (quoting

*Escobar*, 579 U.S. at 196).

Here, Relators do not allege—let alone allege with particularity—that Defendant's

admission of "17 year olds to the Adult Inpatient service, and the admission of 18 year olds to

the Children's Inpatient service," in violation of state regulations, would have caused the federal

---

[15] The only individual named in the relevant portion of Relators' First Amended Complaint is Stephanie East—a manager at Centra. *See id.* ¶ 125. Significantly, Relators do not contend that she submitted claims to the government. They merely state that she emailed VDBHDS to discuss a "variance" to "allow[] some adults to be treated in the Child and Adolescent Psychiatric Unit and also allow[] some children to be treated in the Adult Psychiatric Unit." *Id.* ¶¶ 124–25.

government to deny Defendant's claims. FAC (Ex. E). Relators do not allege "'that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with th[is] particular … [state] regulatory… requirement.'" *Boyko*, 39 F.4th at 191 (quoting *Escobar*, 579 U.S. at 195). Nor have Relators cited any federal statute, regulation, or contract requirement that Defendant violated. Simply put, they have not explained why the breach of a *state regulation* would be "so central" to a *federal claim* for payment that the federal "[g]overnment 'would not have paid the[] claim[] had it known of [Defendant's] violations.'" *Boyko*, 39 F.4th at 190 (quoting *Escobar*, 579 U.S. at 196). Relators' silence on this matter is also fatal to Scheme Seven. The Court will, thus, dismiss claims relating to Scheme Seven.

In sum, the Court will dismiss all but one of Relators' claims because they have (1) failed to satisfy Federal Rule of Civil Procedure 9(b) and/or (2) fallen under the weight of the FCA's gatekeeping requirements.

## II.    One of Relators' claims—Scheme Four—not only satisfies Federal Rule of Civil Procedure 9(b) but also states a claim for relief under the FCA; therefore, the Court will (partially) deny Defendant's motion to dismiss as to Scheme Four.

Not all Relators' claims fail; Relators' allegations in Scheme Four—allegations that focus on the malfeasance of a specific doctor as to specific patients—not only satisfy Rule 9(b) but also state a claim under the FCA.[16]

Turning first to Rule 9(b), in Scheme Four, Relators adequately "describe the time, place, and contents of the false representation, as well as the identity of the person making the

---

[16] The Court notes that Scheme Four does not state a claim in its entirety. The Court's holding is limited to allegations involving Dr. Johnson and the nine specific patients identified in Relators' First Amended Complaint. In other words, the Court will hold that Relators have not stated a particularized claim for relief as to the "[o]ther Centra physicians [who allegedly] falsified the amount of time they devoted to consultations" because Relators have not identified these other physicians or their patients. FAC ¶ 110; *see also Nathan*, 707 F.3d at 455–56 (internal quotation marks omitted).

misrepresentation and what [s]he obtained thereby." *Nathan*, 707 F.3d at 455–56 (internal

quotation marks omitted). Relators focus on one doctor—Dr. Lisa Johnson—who "provided

services in [Defendant's] child/adolescent psychiatric unit … in 2017 and 2018." FAC ¶ 105.

They complain that she "billed [specific patients] for services she did not provide, including:

[p]atient histories that never taken or documented; [p]atient discharge summaries that were never

completed; [and p]atient assessments that were never made." *Id.* ¶ 106. In contrast to the other

schemes outlined in Relators' First Amended Complaint, in Scheme Four, Relators identify the

"who, what, when, where, and how" of Dr. Johnson's alleged fraud. *Boyko*, 39 F.4th at 189.

Accordingly, the Court will hold that Scheme Four passes muster under Federal Rule of Civil

Procedure 9(b).

Likewise, Scheme Four states a claim for relief under the FCA. Relators aver that "actual

false claims were submitted by [Defendant] to the Government—the *sine qua non* of a FCA

violation." Dkt. 26 at 1 (emphasis in original). Specifically, Relators state that Dr. Johnson

submitted "false claims … for consultations with" nine identified patients by billing for specific

services that were never provided. FAC ¶¶ 110, 106. In addition, Defendant's executives

supposedly knew of these false claims, *id.* ¶ 108, but did not intervene, even as Defendant

"received payment from Medicare and Medicaid programs to which it was not entitled," *id.*

¶ 111.

Taken together, Relators' allegations, if true, demonstrate that (1) "'there was a false

statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3)

that was material; and (4) that caused the government to pay out money or to forfeit moneys

due.'" *Boyko*, 39 F.4th at 188 (citation omitted). By billing for services that were never provided,

Dr. Johnson's alleged conduct falls neatly within the ambit of the FCA—a statute designed to

combat fraudsters who billed the United States "for nonexistent or worthless goods." *United States v. McNinch*, 356 U.S. 595, 599 (1958). Moreover, "[c]ommon sense tells us" that the government would not have paid for services that were never provided. *Boyko*, 39 F.4th at 193. And significantly, in pleading Scheme Four, Relators have not only included ample "'indicia of reliability' … than an actual false claim was *presented* to the government," *Nathan*, 707 F.3d at 457 (emphasis added), but they also have identified specific Centra executives who "ha[d] actual knowledge" of the scheme, *see* 31 U.S.C. § 3729(b) (cleaned up); FAC ¶ 108; *see also* Fed. R. Civ. P. 9(b) (noting that "knowledge[] and other conditions of a person's mind may be alleged generally"). In sum, Relators have stated a claim for relief, and as a result, the Court will partially deny Defendant's motion to dismiss. Dkt. 25.

In conclusion, all but one of Relators' identified schemes fail to state a claim for relief. Nonetheless, one scheme—Scheme Four—does state a claim under the FCA, at least in part. Thus, the Court will grant Defendant's motion to dismiss, in part, and deny it, in part.

CONCLUSION

For the above reasons, Defendant's motion to dismiss is **GRANTED**, in part, and **DENIED**, in part. Dkt. 25.

It is **SO ORDERED**.

The Clerk of Court is directed to send this Memorandum Opinion and Order to all counsel of record.

Entered this 20th day of March 2024.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE